# EXHIBIT A

# Plaintiffs' Verified Complaint

Electronically Filed
10/7/2025 3:37 PM
Steven D. Grierson
CLERK OF THE COURT

Todd E. Kennedy, Esq.
Nevada Bar No. 6014
Martin A. Little, Esq.
Nevada Bar No. 7067
Jonathan W. Fountain, Esq.
Nevada Bar No. 10351
HOWARD & HOWARD ATTORNEYS PLLC
3800 Howard Hughes Parkway, Suite 1000
Las Vegas, Nevada 89169
Telephone: (702) 257-1483
Email: tek@h2law.com
Email: mal@h2law.com
Email: jwf@h2law.com

*Attorneys for Plaintiffs RiskOn International,
Ecoark, Inc., and Hyperscale Data, Inc.*

CASE NO: A-25-929990-B
Department 9

### EIGHTH JUDICIAL DISTRICT COURT
### CLARK COUNTY, NEVADA

RISKON INTERNATIONAL, INC. f/k/a
BITNILE METAVERSE, INC. and/or
ECOARK HOLDINGS, INC., a Nevada
corporation; ECOARK, INC., a Delaware
corporation; and HYPERSCALE DATA INC.,
a Delaware corporation;

        Plaintiffs,

v.

ZEST LABS HOLDINGS, LLC, a Nevada
limited liability company; and GARY
METZGER, an individual;

        Defendants.

**VERIFIED COMPLAINT**

**(JURY DEMAND)**

**[BUSINESS COURT MATTER –
EDCR 1.61(a)(2)(iii) – CLAIMS
ARISING FROM THE PURCHASE
OR SALE OF THE STOCK OF A
BUSINESS]**

**[EXEMPT FROM ARBITRATION –
NAR 5(a)(1)(G), (I), (J) – ACTION
SEEKING DECLARATORY AND
EQUITABLE/EXTRAORDINARY
RELIEF IN BUSINESS COURT]**

        Plaintiffs RiskOn International, Inc. (formerly known as BitNile Metaverse, Inc. and/or

Ecoark Holdings, Inc.), Ecoark, Inc. and Hyperscale Data Inc., by and through their attorneys

Howard & Howard Attorneys PLLC, file this Complaint against Defendants Zest Lab Holdings,

LLC and Gary Metzger, and alleges the following:

### THE PARTIES

        1.     Plaintiff RiskOn International, Inc. ("RiskOn") is a Nevada corporation

headquartered in Las Vegas, Nevada. RiskOn was formerly known as BitNile Metaverse, Inc. and/or

Ecoark Holdings, Inc., and is identified here to include its operations under each of those former

names. RiskOn is the parent company of Plaintiff Ecoark, Inc.

HOWARD & HOWARD ATTORNEYS PLLC

13008190-14

2.      Plaintiff Ecoark, Inc. ("Ecoark") is a Delaware corporation, whose headquarters are located in Las Vegas, Nevada. Ecoark is a subsidiary of Plaintiff RiskOn.

3.      Plaintiff Hyperscale Data, Inc. ("Hyperscale") is a Delaware corporation whose headquarters are located in Las Vegas, Nevada. Hyperscale is a public company, and its shares trade on the NYSE American under the symbol "GPUS." Hyperscale owns approximately 85% of the voting stock of Plaintiff RiskOn.

4.      Defendant Zest Labs Holdings, LLC ("Zest Holdings") is a Nevada limited liability company formed by Defendant Gary Metzger.

5.      Defendant Gary Metzger ("Metzger") is an Arkansas resident. On information and belief, Metzger is the sole member and manager of Zest Holdings.

## JURISDICTION AND VENUE

6.      This Court has original, subject matter jurisdiction over this action, pursuant to Article 6, Section 6, of the Constitution of the State of Nevada, because this is a case excluded by law from the original jurisdiction of the justices' courts.

7.      This Court has personal jurisdiction over each of the Defendants pursuant to NRS § 14.020 or alternatively based on their acts and omissions relevant to this action, which, on information and belief, were committed in Nevada, making jurisdiction appropriate under NRS § 14.065. The contract at issue is between Nevada businesses and has significant ties to Nevada and the exercise of personal jurisdiction over the Defendants is otherwise reasonable.

8.      Venue is appropriate in this judicial district, pursuant to NRS § 13.010, because Defendant Zest Holdings agreed to perform the contract at issue with or for the benefit of Plaintiffs, which are Nevada businesses located in Las Vegas, Nevada.

## GENERAL ALLEGATIONS

### *The Walmart Litigation and its Proceeds*

9.      In 2022, Plaintiff RiskOn, then known as Ecoark Holdings, Inc., decided to divest its principal operating assets through a series of spin-offs or stock dividends to the Company's stockholders. Plaintiff RiskOn's Quarterly Report on Form 10-Q for its fiscal quarter ended December 31, 2022 filed with the Securities and Exchange Commission (the "SEC") on February

HOWARD & HOWARD ATTORNEYS PLLC

21, 2023, disclosed that, "the Company had decided it was in the best interests of its stockholders that it divest all of its principal operating assets through a series of spin-offs or stock dividends to the Company's stockholders."

10.    One of RiskOn's subsidiaries was Zest Labs, Inc. ("Zest Subsidiary"), which was then in litigation with Walmart Inc. over alleged theft of trade secrets (the "Walmart Litigation"). Zest Subsidiary also owned a portfolio of more than 60 patents relating to its food preservation methods.

11.    To achieve its corporate objective, Plaintiff RiskOn initially decided to spin off 100% of Zest Subsidiary's common stock to Plaintiff RiskOn's shareholders. In anticipation of the spinoff, on October 28, 2022, Plaintiff RiskOn and Plaintiff Ecoark each assigned to Zest Subsidiary all of their respective intellectual property rights in Zest Subsidiary's patents and their claims against Walmart.

12.    Plaintiff RiskOn subsequently decided to consummate an alternative transaction, which it believed would provide an equivalent benefit to its shareholders. On information and belief, on May 23, 2023, Defendant Metzger formed Defendant Zest Holdings for the purpose of acquiring Zest Subsidiary and later distributing any proceeds from the Walmart Litigation to Plaintiff RiskOn's shareholders. Defendant Metzger was then, and as of the date hereof remains, a member of RiskOn's Board of Directors and was therefore familiar with RiskOn's plans.

13.    On August 28, 2023, Plaintiff RiskOn and its subsidiary, Plaintiff Ecoark, entered into a Stock Purchase Agreement (the "SPA") with Defendant Zest Holdings. A true and correct copy of the SPA is annexed as Exhibit 1. Under the SPA, Plaintiff Ecoark agreed to sell its entire interest in Zest Subsidiary to Defendant Zest Holdings. In exchange, Defendant Zest Holdings agreed to "facilitate the distribution of net proceeds derived from" the Walmart Litigation to Plaintiff RiskOn's shareholders who held shares of RiskOn as of November 15, 2022. Defendant Zest Holdings made no other payment to RiskOn (or Ecoark) in exchange for 100% of the shares of Zest Subsidiary. Plaintiff RiskOn filed a Current Report on Form 8-K with the SEC on September 1, 2023, disclosing the transaction as follows:

Pursuant to a stock purchase agreement (the "SPA"), the Company [RiskOn] has

agreed to sell all its outstanding shares of Zest Labs to Zest Labs Holdings, LLC, ("Zest Holdings") a new entity specifically created for this spin-off (the "Transaction"). The purpose of Zest Holdings is to preserve and monetize ongoing lawsuits involving Zest Labs, as of November 15, 2022, including Zest Labs' lawsuit against Walmart, Inc. (the "Pending Litigation").

The Transaction is also intended to fulfill the Company's previous commitment to spin-off Zest Labs to those shareholders who held the Company's common stock as of November 15, 2022 ("Record Date Holders").

A true and correct copy of the Form 8-K is annexed as Exhibit 2.

14.    The principal parties to the SPA (Plaintiffs Ecoark and RiskOn, on one hand, and Defendant Zest Holdings, on the other) acknowledged and understood that Defendant Zest Holdings was created "for the benefit of [Plaintiff RiskOn's] security holders entitled to participate in [the] distribution" contemplated by the SPA. In light of the reason and purpose for which Defendant Zest Holdings was formed and for which the SPA was executed—namely to distribute any proceeds from the Walmart Litigation to Plaintiff RiskOn's stockholders, Defendants Metzger and Zest Holdings assumed the role of fiduciaries to Plaintiffs and, therefore, owed fiduciary duties of care and loyalty to Plaintiffs (as well as duties of good faith and fair dealing) to operate Defendant Zest Holdings in the best interests of Plaintiffs and RiskOn's stockholders and for the express and sole purpose of distributing any proceeds from the Walmart Litigation to RiskOn's stockholders. As the SPA makes clear, Defendant Zest Holdings had no stake in the Walmart Litigation and its sole obligation was to receive the proceeds from the Walmart Litigation and distribute the net proceeds to RiskOn's stockholders.

15.    Unfortunately, after the SPA was executed and Defendant Zest Holdings received ownership of Zest Subsidiary, Defendants took no steps to identify the stockholders who owned RiskOn stock as of November 15, 2022 and were supposed to be entitled to receive a distribution. Upon information and belief, when the SPA was executed, approximately 80% of RiskOn's shares were held through brokerage accounts and not in the name of the individuals and entities who actually owned the shares. Upon further information and belief, Defendants are unable to reliably identify those RiskOn stockholders entitled to receive distributions and are, therefore, unable to distribute the bulk of the proceeds from the Walmart Litigation, in violation of their fiduciary and contractual duties.

*Events Subsequent to the Walmart Litigation Settlement*

16.     In June 2025, it was publicly reported that Zest Subsidiary had secured a $222.7 million verdict against Walmart in the Walmart Litigation. On July 30, 2025, press reports announced that the parties had reached a post-verdict settlement of the litigation. Upon information and belief, the settlement provided Zest Holdings with a substantial cash payment (the "Walmart Litigation Proceeds"). True and correct copies of these press reports are annexed as Exhibits 3 and 4.

17.     Since the July, 2025 settlement, Defendants have failed to make any distribution from the Walmart Litigation Proceeds to RiskOn's stockholders and have instead: (a) indicated they will distribute 80% of the net proceeds to an unintended recipient; (b) refused to account for and substantiate tens of millions of dollars in "expenses" they intend to deduct from the proceeds including an unauthorized multi-million-dollar fee demanded by Defendant Metzger personally; and (c) threatened to further inflate these so-called "expenses" by unnecessarily hiring professionals, including a costly legal team, and other outside advisors. As it presently stands, there is no assurance that a proper distribution of the Walmart Litigation Proceeds will ever occur, and the litigation proceeds, which are held by Defendants in trust for the sole benefit of RiskOn's stockholders, is in danger of being wasted through Defendants' reckless actions and/or being depleted by Defendants through their deduction of excessive, improper, and unauthorized expenses and fees.

18.     For example, Defendant Zest Holdings has indicated that only one-third or less of the Walmart Litigation Proceeds may be available for distribution with the balance consumed by expenses. Furthermore, Defendants have rejected multiple requests to document the alleged expenses, claiming that Plaintiffs have no rights under the SPA to that information and that Defendants can spend the Walmart Litigation Proceeds as they see fit.

19.     Defendants have now threatened to retain a costly professional team to locate originally intended recipients of the proceeds. Plaintiffs previously undertook the exercise of locating stockholders for another dividend to RiskOn stockholders and shared their work product with Defendants. Without explanation, Defendants have stated that they will spend unspecified sums in an effort to duplicate this work. Any problems in locating the RiskOn stockholders entitled to

receive the Walmart Litigation Proceeds arise from Defendants' reckless, grossly negligent, and/or negligent failure to act earlier.

20.    As an alternative, Defendants have announced they will distribute the litigation proceeds in a manner that will defeat the SPA and cause substantial loss. According to Defendants, the distributions should go, not to investors who actually owned RiskOn stock as of November 15, 2022, but only to those named on RiskOn's stock ledger as of that date. This, however, would deprive the majority of RiskOn stockholders of their share of the proceeds. Approximately 80% of RiskOn's shares were held in brokerage accounts and thus appear on the stock ledger collectively as "Cede & Co.," a nominee name for the Depository Trust Company ("DTC"). DTC does not maintain records of shares held in individual brokerage accounts. DTC's records concern the ownership of shares held by its "participants," which are large broker-dealers who act as clearing brokers, often holding shares for smaller broker dealers referred to as "introducing brokers." DTC's participants have no ability to determine share ownership by individual account holders three years after the fact and often have no records at all concerning the individual accounts held with introducing brokers.

21.    Rather than distribute the Walmart Litigation Proceeds to the actual RiskOn stockholders entitled to receive them, Defendants announced in an October 7, 2025 letter to the handful of RiskOn shareholders they have managed to identify that they intend to issue a multi-million dollar check to DTC. If this occurs, Plaintiffs believe DTC will either keep the funds for itself, or distribute them to its participants, who will keep them for themselves. Sending any litigation proceeds to DTC will, in effect, send those monies into a black hole, depriving RiskOn's stockholders of their dividend and depriving Plaintiffs of the benefit of their bargain under the SPA. For example, Plaintiff Hyperscale held a significant number of RiskOn shares in its brokerage accounts. The proposed distribution would deprive Plaintiff Hyperscale of the litigation proceeds it is entitled to.

22.    Defendants have made clear that they intend to pocket any litigation proceeds returned by DTC and/or if RiskOn's eligible stockholders cannot be located. If Defendants are unwilling or unable to comply with the SPA, there is no reason for them to receive an unjust windfall, which in this case might well exceed $10 million, to the substantial detriment RiskOn and the RiskOn

stockholders who are actually entitled to receive the litigation proceeds. Accordingly, if some RiskOn stockholders cannot be located—and it is a certainty that some or even most of them cannot be— then any undistributed funds should be returned to RiskOn.

23.    Defendants have acted in bad faith and in breach of their fiduciary duties in a bid to capture and retain the Walmart Litigation Proceeds that belong to RiskOn's stockholders. Defendant Zest Holdings is owned and controlled by Defendant Metzger. Defendant Metzger dominates Defendant Zest Holdings, influencing and governing its actions with absolute control, answering only to himself and for his personal benefit. Accordingly, there is such a unity of interest and ownership between Defendant Metzger and Defendant Zest Holdings that one is inseparable from the other. Based on Defendants' bad faith conduct, including the formation of Defendant Zest Holdings to acquire Zest Subsidiary and its assets for the express purpose of distributing the Walmart Litigation Proceeds to RiskOn's eligible stockholders, adherence to the corporate form would sanction a fraud or promote injustice. Defendants Metzger and Zest Holdings are each the alter-ego of the other such that Defendant Metzger should be personally responsible for Defendant Zest Holdings' obligations and liabilities.

## COUNT I

### Declaratory Relief

24.    Plaintiffs restate the allegations in paragraphs 1 through 23 above, as though fully restated here.

25.    As set forth above, there is an active, present and justiciable controversy regarding the rights and obligations of the parties under the SPA and common law.

26.    By reason of the foregoing, Plaintiffs are entitled to a declaratory judgment declaring the rights of the parties to the SPA, including but not limited to, the following:

   a.    That Plaintiffs RiskOn and Ecoark are parties to the SPA, entitled to enforce its terms;

   b.    That Defendants may not distribute the proceeds of the Walmart Litigation to DTC;

   c.    That Defendants must promptly distribute the net proceeds of the Walmart Litigation to RiskOn stockholders based on their actual beneficial ownership, according to their brokerage

account or other proof;

d.    That Defendants must use the list of RiskOn stockholders previously prepared by Plaintiffs;

e.    That, to the extent RiskOn's eligible stockholders cannot be located, Defendants must return any net proceeds allocated to those stockholders to Plaintiff RiskOn;

f.    That Plaintiff Hyperscale is entitled to receive a distribution of the net proceeds of the Walmart Litigation in an amount equal to its ownership of RiskOn's common stock as of November 15, 2022 and its Class A preferred shares on an as-converted basis, which equals approximately 14.9% of the net proceeds of the Walmart Litigation;

g.    That, under Section 7.1 of the SPA, Defendants must provide an accounting of: (a) the amount of settlement proceeds received by Zest Holdings in connection with the Walmart Litigation; (b) Zest Holdings' calculation of what the "net" proceeds from the Walmart Litigation settlement are; and (c) each of the expenses Zest Holdings has incurred to distribute the net proceeds of the Walmart Litigation settlement;

h.    That Defendant Metzger has no right to charge fees without the consent of Plaintiffs;

i.    That Defendants are not permitted under the SPA to use the net proceeds of, or any interest derived from, the Walmart Litigation Proceeds to defend against this action; and

j.    That Defendant Metzger is the alter ego of Defendant Zest Holdings, and vice versa such that adherence to the corporate form of Zest Holdings would sanction a fraud or promote injustice.

## COUNT II

### Breach of Contract

27.    Plaintiffs RiskOn and Ecoark restate the allegations in paragraphs 1 through 26 above, as though fully restated here.

28.    The SPA constitutes a valid and enforceable contract between Plaintiff Ecoark and Defendant Zest Holdings.

29.    Plaintiffs RiskOn and Ecoark have fully performed their obligations under the SPA.

30.    Defendants, having received full performance through the transfer of Zest

Subsidiary's shares (and its assets) to Defendant Zest Holdings, have failed to distribute the net proceeds from the Walmart Litigation, and are unable to distribute a significant portion, estimated at 80%, of those proceeds, to RiskOn stockholders who owned shares as of November 15, 2022. As a result, Defendants are in material and substantial breach of the SPA. The breach is material and substantial to such a degree as to treat the SPA as terminated and/or rescinded, and indeed, the actions and threatened actions of Defendants are such that the purpose and intent of the SPA has been destroyed.

31.    As the direct and proximate result of Defendants' breach of the SPA, Plaintiffs are suffering and, unless Defendants are temporarily, preliminarily, and/or permanently enjoined, will continue to suffer irreparable harm and injury because the harm and injury to Plaintiffs arising from Defendants' failure to distribute the Walmart Litigation Proceeds to RiskOn's eligible stockholders is unquantifiable. Furthermore, the Walmart Litigation Proceeds constitute a discrete fund, the imminently threatened depletion of which by Defendants, will leave Plaintiffs without any remedy whatsoever. Accordingly, Plaintiffs have no adequate remedy at law.

32.    As the direct and proximate result of Defendants' breach of the SPA, and in addition to the irreparable harm they are suffering, Plaintiffs have been damaged in an amount exceeding $15,000.

33.    Any retention of the Walmart Litigation Proceeds by Defendants would be inequitable and would unjustly enrich the Defendants who failed to perform the core purpose of the SPA. Accordingly, the interests of justice and fairness require the transfer of the net proceeds of the Walmart Litigation to Plaintiffs RiskOn and Ecoark.

34.    In the alternative, Plaintiffs are entitled to entry of an order requiring specific performance of the SPA and directing Defendants to promptly distribute promptly the net proceeds of the Walmart Litigation to RiskOn's stockholders based on their actual beneficial ownership according to their brokerage account or other proof. To the extent RiskOn's eligible stockholders cannot be located, any net proceeds allocated to those stockholders should be delivered to Plaintiff RiskOn.

35.    It has been necessary for Plaintiffs to retain the services of attorneys to bring this

action and so Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs.

## COUNT III

### Breach of The Implied Covenant of Good Faith And Fair Dealing
### (Contractual and Tortious)

36.    Plaintiffs RiskOn and Ecoark restate the allegations in paragraphs 1 through 35 above, as though fully restated here.

37.    The SPA constitutes a valid and enforceable contract between Plaintiffs Ecoark and RiskOn on one hand, and Defendant Zest Holdings on the other.

38.    There is implied into every contract in Nevada a covenant of good faith and fair dealing.

39.    By and through the formation of Defendant Zest Holdings to receive and distribute the Walmart Litigation Proceeds to RiskOn's eligible stockholders and by and through Defendants execution of the SPA for that express purpose, a special relationship of trust and confidence was created between Plaintiffs and Defendants, pursuant to which Defendants were required, at all relevant times, to act in good faith, with reasonable care, and with undivided loyalty to Plaintiffs and their best interests.

40.    Plaintiffs relied upon the special trust and confidence they placed in Defendants by, among other things, authorizing Defendant Metzger to form Defendant Zest Holdings and enter into the SPA, thereby transferring the shares of Zest Subsidiary to Defendant Zest Holdings along with all of its assets, including the right to recover Walmart Litigation Proceeds.

41.    Notwithstanding the special relationship between Plaintiffs and Defendants, Defendants acted in bad faith and in a grievous and perfidious manner inconsistent with the spirit, intent, and purpose of the SPA. By and through their actions and inactions, Defendants have breached the SPA and deprived Plaintiffs of the intended benefits and performance of the SPA. They have done so by, among other actions and inactions, improperly and unnecessarily depleting the Walmart Litigation Proceeds, attempting to make unauthorized charges against the Walmart Litigation Proceeds, and intending to imminently dissipate the Walmart Litigation Proceeds, and to otherwise impose extraordinary delay in the distribution of the Walmart Litigation Proceeds,

depriving RiskOn's stockholders of those funds while Defendants unjustly benefit by retaining them.

42.　As the direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiffs are suffering and, unless Defendants are temporarily, preliminarily, and/or permanently enjoined, will continue to suffer irreparable harm and injury because the harm and injury to Plaintiffs arising from Defendants' failure to distribute the Walmart Litigation Proceeds to RiskOn's eligible stockholders is unquantifiable. Furthermore, since the Walmart Litigation Proceeds constitute a discrete fund, the imminently threatened depletion thereof by Defendants will leave Plaintiffs without any remedy whatsoever. Accordingly, Plaintiffs have no adequate remedy at law.

43.　As the direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, and in addition to the irreparable harm they are suffering, Plaintiffs have been damaged in an amount exceeding $15,000.

44.　It has been necessary for Plaintiffs to retain the services of attorneys to bring this action and Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs.

## COUNT IV

### Accounting

45.　Plaintiffs incorporate by reference the allegations in paragraphs 1 through 44 above.

46.　Under the SPA, Defendant Zest Holdings agreed that, in consideration for its acquisition of Zest Subsidiary's stock, it would facilitate "the distribution of net proceeds derived from Zest Subsidiary's litigation against Walmart "to RiskOn stockholders as of November 15, 2022," i.e., every registered holder and beneficial owner as of such date. In doing so, Defendants acted as fiduciaries for the true owners of the Walmart Litigation Proceeds.

47.　Plaintiffs have made multiple requests to Defendants seeking a full accounting of the "net" proceeds of the Walmart Litigation, as well as other information regarding the settlement between Zest Subsidiary and Walmart.

48.　Defendants have firmly and unreasonably refused Plaintiffs' requests, claiming that Plaintiffs have no right to the information they are seeking under the SPA.

49.　However, Defendant's unreasonable position is contradicted by, among other things,

HOWARD & HOWARD ATTORNEYS PLLC

the "further assurances" clause in the SPA, which requires Defendant Zest Holding to take "any further action" that is "necessary or desirable to carry out the purposes of [the SPA]."

50.     Because Plaintiff Ecoark and RiskOn are parties to the SPA, and because the express purpose of the SPA was to "facilitate" a distribution of Defendant Zest Holdings' assets to RiskOn stockholders, it is plainly "necessary and desirable" for Plaintiffs to receive basic information regarding the settlement and how Defendant Zest Holdings has gone about calculating its paltry "net" proceeds amount and exorbitant expenses.

51.     As an intended recipient of the discrete fund, Plaintiff Hyperscale is also entitled to an accounting.

52.     Information regarding the settlement, its terms, and any expenses incurred by Defendant Zest Holdings is peculiarly within the knowledge of Defendant Zest Holdings.

53.     Plaintiffs have satisfied their obligations under the SPA, whereas Defendant Zest Holdings has breached its obligations. Because Plaintiffs have no adequate remedy at law, they are entitled to an order requiring Defendant Zest Holdings to provide an accounting of the total quantum of the settlement, its fee arrangements with various vendors involved in securing the settlement, its calculation of "net" proceeds, and to damages for any sums spent in property.

## COUNT V

### Constructive Trust

54.     Plaintiffs incorporate by reference the allegations in paragraphs 1 through 53 above.

55.     Under the SPA, Defendant Zest Holdings agreed to "facilitate the distribution of net proceeds derived from the Company's litigation to" eligible RiskOn stockholders.

56.     Defendants have made clear that they intend to waste and/or loot the net proceeds of the Walmart Litigation.

57.     A constructive trust was created by Defendant Zest Holdings' express promise under the SPA and by virtue of the special relationship that arose between Defendant Zest Holdings and Plaintiffs for the purpose of receiving and distributing the Walmart Litigation Proceeds to RiskOn's eligible stockholders.

58.     Defendants' retention of the net proceeds of the Walmart Litigation and/or

HOWARD & HOWARD ATTORNEYS PLLC

Defendants' improper distribution of those proceeds would be inequitable.

59.     Accordingly, the imposition of a constructive trust for the benefit of Plaintiffs and RiskOn's eligible stockholders is essential to effect justice.

60.     Plaintiffs are, therefore, entitled to entry of a judgment imposing a constructive trust on the net proceeds of the Walmart Litigation, for the benefit of Plaintiffs and RiskOn's eligible stockholders.

## COUNT VI

Replevin

61.     Plaintiffs incorporate by reference the allegations in paragraphs 1 through 60 above.

62.     Plaintiffs are entitled to the receipt of the net proceeds from the Walmart Litigation.

63.     Those funds are currently in the possession of Defendant Zest Holdings, which has, to date, failed and refused to timely distribute them to RiskOn's eligible stockholders.

64.     Accordingly, Plaintiffs are entitled to an order requiring Defendant Zest Holdings to transfer the net proceeds of the Walmart Litigation to Plaintiffs for distribution to RiskOn's eligible stockholders.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grant judgment against Defendants, jointly and severally, as follows:

A.     Awarding Plaintiffs RiskOn and Ecoark restitution of the proceeds of the settlement of the Walmart Litigation;

B.     Declaring the following in favor of Plaintiffs:

i.     That Plaintiffs RiskOn and Ecoark are parties to the SPA, entitled to enforce its terms;

ii.     That Defendants may not distribute the proceeds of the Walmart Litigation to DTC;

iii.     That Defendants must promptly distribute the net proceeds of the Walmart Litigation to RiskOn stockholders based on their actual beneficial ownership, according to their brokerage account or other proof;

iv.     That Defendants must use the list of RiskOn stockholders previously prepared by Plaintiffs;

v.      That, to the extent RiskOn's eligible stockholders cannot be located, Defendants must return any net proceeds allocated to those stockholders to Plaintiff RiskOn;

vi.     That Plaintiff Hyperscale is entitled to receive a distribution of the net proceeds of the Walmart Litigation in an amount equal to its ownership of RiskOn's common stock as of November 15, 2022 and its Class A preferred shares as converted to common shares, which equals approximately 14.9% of the net proceeds of the Walmart Litigation;

vii.    That, under Section 7.1 of the SPA, Defendants must provide an accounting of: (a) the amount of settlement proceeds received by Zest Holdings in connection with the Walmart Litigation; (b) Defendant Zest Holdings' calculation of what the "net" proceeds from the Walmart Litigation settlement were; and (c) each of the expenses Defendant Zest Holdings has incurred to distribute the net proceeds of the Walmart Litigation settlement;

viii.   That Defendant Metzger has no right to charge fees without the consent of Plaintiffs;

ix.     That Defendants are not permitted under the SPA to use the net proceeds of, or any interest derived from, the Walmart Litigation Proceeds to defend against this action; and

x.      That Defendant Metzger is the alter ego of Defendant Zest Holdings, and vice versa such that adherence to the corporate form of Defendant Zest Holdings would sanction a fraud or promote injustice.

C.      Awarding Plaintiffs specific performance under the SPA directing Defendants to promptly distribute the net proceeds of the Walmart Litigation to RiskOn's eligible stockholders based on their actual beneficial ownership according to their brokerage account or other proof and to the extent such stockholders cannot be located, directing Defendants to return any net proceeds allocated to those stockholders to Plaintiff RiskOn;

D.      Directing Defendant to provide an accounting of the total quantum of the settlement, its fee arrangements with various vendors involved in securing the Walmart Litigation settlement, its calculation of "net" proceeds, and damages for any sums spent improperly;

E.      Declaring that a constructive trust exists for the benefit of RiskOn's stockholders in relation to the net Walmart Litigation Proceeds, such that any distribution of expenses related to those net proceeds requires the express consent of RiskOn;

F.      Requiring Defendant to immediately transfer the net proceeds from the Walmart Litigation to Plaintiff RiskOn for distribution by Plaintiff RiskOn to its eligible stockholders; and

G.      Granting such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: this 7th day of October, 2025

Respectfully submitted,

HOWARD & HOWARD ATTORNEYS PLLC

By:    /s/ Todd E. Kennedy,
Todd E. Kennedy, Esq.
Martin A. Little, Esq.
Jonathan W. Fountain, Esq.
3800 Howard Hughes Parkway, Suite 1000
Las Vegas, Nevada 89169
Telephone: (702) 257-1483

*Attorneys for Plaintiffs RiskOn International, Ecoark, Inc., and Hyperscale Data, Inc.*

## VERIFICATION

I, Henry Nisser, declare that I am an authorized agent of the above-named Plaintiffs, a member of the Board of Directors of RiskOn International, Inc. and President, General Counsel of Hyperscale Data, Inc. and have read the above allegations and that they are true based upon my personal knowledge and/or the knowledge of the Plaintiff entities and/or I believe them to be true based upon information available.

I declare under the penalty of perjury under the law of the State of Nevada the foregoing is true and correct.

Henry Nisser
Dated October 7, 2025.

- 15 -

# Exhibit 1

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (the "Agreement") entered into this ___ day of August, 2023, by and between Ecoark, Inc., a Delaware corporation (the "Seller") and Zest Labs Holdings, LLC (the "Purchaser"), and, for purposes of certain provisions set forth herein, BitNile Metaverse, Inc. a Nevada corporation formerly known as Ecoark Holdings, Inc ("Ecoark"). The Seller and the Purchaser may sometimes be referred to herein collectively as the "Parties".

WHEREAS, the Seller owns 100% of the outstanding shares of capital stock (the "Shares") of Zest Labs, Inc., a Delaware corporation (the "Company");

WHEREAS, Ecoark, the parent company of the Seller, has previously indicated in public filings with the Securities and Exchange Commission that it intends to spin-off the common stock of the Company held by the Seller to Ecoark's security holders of record as of November 15, 2022 (the "Record Date Owners");

WHEREAS, following the announcement of the spin-off of the Company, Ecoark recognized that the Company did not have the revenue to and could not otherwise operate as a public company and determined to instead distribute the net proceeds from certain assets of the Company, including from the litigation proceeds, to the Record Date Owners, and the Purchaser was formed for the benefit of Ecoark's security holders entitled to participate in such distribution in the furtherance thereof;

WHEREAS, in order to facilitate the above-described distribution by Ecoark, and for the other consideration described herein, the Seller desires to sell the Shares to the Purchaser, and the Purchaser desires to purchase such Shares from the Seller, on the terms set forth in this Agreement and to protect the rights of the Record Date Owners.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    **Sale and Purchase of Shares**.  The Seller agrees to sell and the Purchaser agrees to purchase the Shares for the consideration contained in this Agreement and subject to the terms and conditions of this Agreement.

2.    **Consideration for Purchase**.

(a)    The Seller hereby acknowledges the valuable consideration in full to be received by the Seller, by virtue of transferring the Shares to the Purchaser, which transfer will facilitate the distribution of net proceeds derived from the Company's litigation to the Record Date Owners and is consistent with the expectations of such Record Date Owners.  Each party hereto further acknowledges and agrees that it will receive good and valuable consideration for entering into this Agreement.

(b)    Upon the execution and delivery of this Agreement, in exchange for the

consideration described above, the Shares shall be delivered by the Purchaser to the Seller and the certificates for the Shares and a stock power endorsed in blank shall be delivered by the Seller to the Purchaser.

(c)    Each of Ecoark and the Seller hereby waives any and all claims it has, or may have in the future, against the Purchaser or the Company arising from, relating to, or with respect to the sale of the Shares and the related transactions contemplated hereby or described herein.

3.    **Representations and Warranties of the Seller and Ecoark**.  As an inducement to the Purchaser to enter into this Agreement and consummate the transactions contemplated hereby, each of the Seller and Ecoark hereby makes the following representations and warranties, each of which is materially true and correct on the date of this Agreement:

3.1    The Seller is the record and beneficial owner of all of the Shares and the Seller owns the Shares, free of any claim, lien, security interest or encumbrance of any nature or kind and, as such, has the exclusive right and full power to sell, transfer and assign the Shares free of any such claim, lien, security interest or encumbrance;

3.2    Each of the Seller and Ecoark has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  This Agreement constitutes the valid and legally binding obligation of the Seller and Ecoark, enforceable in accordance with its terms. The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby have been duly authorized by the Seller and Ecoark;

3.3    The execution and delivery of this Agreement by the Seller and Ecoark, and the observance and performance of the terms and provisions contained herein do not constitute a violation or breach of any applicable law, or any provision of any other contract or instrument to which the Seller or Ecoark is a party or by which it is bound, or any order, writ, injunction, decree, statute, rule, by-law or regulation applicable to the Seller or Ecoark;

3.4    There are no actions, suits, or proceedings pending or, to the best of the Seller's knowledge or Ecoark's knowledge, threatened, which could in any manner restrain or prevent the Seller from effectually and legally selling the Shares pursuant to the terms and provisions of this Agreement;

3.5    Neither the Seller nor Ecoark has any liability or obligation to pay fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement.

4.    **Representations and Warranties of the Purchaser**.  As an inducement to the Seller and Ecoark to enter into this Agreement and to consummate the transactions contemplated hereby, the Purchaser hereby makes the following representations and warranties, each of which is true and correct on the date of this Agreement:

4.1    The Purchaser has full power and authority to execute and deliver this

2

Agreement and to perform its obligations hereunder.  This Agreement constitutes the valid and legally binding obligation of the Purchaser, enforceable in accordance with its terms. The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby have been duly authorized by the Purchaser;

      4.2   The execution and delivery of this Agreement by the Purchaser and the observance and performance of the terms and provisions of this Agreement on the part of the Purchaser to be observed and performed will not constitute a violation of applicable law or any provision of any contract or other instrument to which the Purchaser is a party or by which it is bound, or any order, writ, injunction, decree statute, rule or regulation applicable to it;

      4.3   No insolvency proceedings of any character, including without limitation, bankruptcy, receivership, reorganization, composition or arrangement with creditors, voluntary or involuntary, designating the Purchaser as the bankrupt or the insolvent, are pending or, to the knowledge of the Purchaser, threatened and the Purchaser has not made an assignment for the benefit of creditors, nor has Purchaser taken any action with a view to, or which would constitute the basis for, the institution of any such insolvency proceedings;

      4.4   There are no actions, suits, or proceedings pending or, to the best of the Purchaser's knowledge, threatened, which could in any manner restrain or prevent the Purchaser from effectually and legally purchasing the Shares pursuant to the terms and provisions of this Agreement;

      4.5   The Purchaser has no liability or obligation to pay fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement;

      4.6   The Purchaser is acquiring the Shares for its own account for investment and not with a view to, or for sale in connection with, any distribution thereof, nor with any present intention of distribution or selling the same, and, except as contemplated by this Agreement, and has no present or contemplated agreement, undertaking, arrangement, obligation, indebtedness or commitment providing for the disposition thereof.  The Purchaser understands that the Shares may not be sold, transferred or otherwise disposed of without registration under the Securities Act of 1933 (the "Act") or an exemption therefrom, and that in the absence of an effective registration statement covering the Shares or an available exemption from registration under the Act, the Shares must be held indefinitely; and

      4.7   The offer to sell the Shares was directly communicated to the Purchaser by the Seller.  At no time was the Purchaser presented with or solicited advertisement, articles, notice or other communication published in any newspaper, television or radio or presented at any seminar or meeting, or any solicitation by a person not previously known to the undersigned in connection with the communicated offer.

      5.   **Survival of Representations and Warranties and Agreements**.   All representations and warranties of the parties contained in this Agreement shall survive the date of this Agreement and shall not be affected by any investigation made prior to the date of this Agreement.

6.    **Indemnification**.

6.1    <u>Indemnification Provisions for Benefit of the Purchaser</u>.  In the event the Seller or Ecoark breaches any of its representations, warranties, and/or covenants contained herein and provided that the Purchaser makes a written claim for indemnification against the Seller or Ecoark, then each of the Seller or Ecoark, severally and not jointly agrees to indemnify the Purchaser from and against the entirety of any losses, damages, amounts paid in settlement of any claim or action, expenses, or fees including court costs and reasonable attorneys' fees and expenses.

6.2    <u>Indemnification Provisions for Benefit of the Seller</u>.  In the event the Purchaser breaches any of its representations, warranties, and/or covenants contained herein and provided that the Seller make a written claim for indemnification against the Purchaser, then the Purchaser agree to indemnify the Seller from and against the entirety of any losses, damages, amounts paid in settlement of any claim or action, expenses, or fees including court costs and reasonable attorneys' fees and expenses.

7.    **Additional Covenants.** The Parties covenant and agree as follows:

7.1    <u>General.</u>  If any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instruments and documents) as the other Party may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefore under Section 6).

7.2    <u>Seller</u>.  The Seller hereby covenants that the Seller will, at the request of the Purchaser, execute, acknowledge and deliver to the Purchaser without further consideration, all such further assignments, conveyances, consents and other documents, and take such other action, as the Purchaser may reasonably request (a) to transfer to, vest and protect in the Purchaser and its right, title and interest in the Shares, and (b) otherwise to consummate or effectuate the transactions contemplated by this Agreement.

8.    **Expenses**.  Except as otherwise provided in this Agreement, all parties hereto shall pay their own expenses, including legal and accounting fees, in connection with the transactions contemplated herein.

9.    **Severability**.  In the event any parts of this Agreement are found to be void, the remaining provisions of this Agreement shall nevertheless be binding with the same effect as though the void parts were deleted.

10.    **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  The execution of this Agreement may be by actual or facsimile signature.

11.    **Benefit**.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their legal representatives, successors and assigns.  Nothing in this Agreement,

expressed or implied, is intended to confer on any person other than the Parties or their respective heirs, successors and assigns any rights, remedies, obligations, or other liabilities under or by reason of this Agreement.

12.    **Notices and Addresses**. All notices, offers, acceptance and any other acts under this Agreement (except payment) shall be in writing, and shall be sufficiently given if delivered to the addressees in person, by Federal Express or similar overnight next business day delivery, or by facsimile delivery followed by overnight next business day delivery, as follows:

To the Seller or Ecoark:            Zest Labs, Inc.
                                    303 Pearl Parkway
                                    Suite 200
                                    San Antonio, TX
                                    Attention: Randy May

To the Purchaser:            The address set forth on the signature page attached hereto or to such other address as any of them, by notice to the other may designate from time to time.

13.    **Attorney's Fees**.  In the event that there is any controversy or claim arising out of or relating to this Agreement, or to the interpretation, breach or enforcement thereof, and any action or arbitration proceeding is commenced to enforce the provisions of this Agreement, the prevailing party shall be entitled to a reasonable attorney's fee, including the fees on appeal, costs and expenses.

14.    **Oral Evidence**.  This Agreement constitutes the entire Agreement between the parties and supersedes all prior oral and written agreements between the parties hereto with respect to the subject matter hereof.  Neither this Agreement nor any provision hereof may be changed, waived, discharged or terminated orally, except by a statement in writing signed by the party or parties against which enforcement or the change, waiver discharge or termination is sought.

15.    **Section Headings**.  Section headings herein have been inserted for reference only and shall not be deemed to limit or otherwise affect, in any matter, or be deemed to interpret in whole or in part any of the terms or provisions of this Agreement.

*[Signature Pages Attached]*

5

IN WITNESS WHEREOF the parties hereto have set their hand and seals as of the above date.

**Seller:**

Ecoark, Inc.

By: _____
Name: Jay Puchir
Title: Chief Executive Officer

**Ecoark:**

BitNile Metaverse, Inc.

By: _____
Name: Randy S. May
Title: Chief Executive Officer

**Purchaser:**

Zest Labs Holdings, LLC

By: _____
Name: Gary Metzger
Title: Manager

6

# Exhibit 2

# UNITED STATES

# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 8-K

### CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): September 1, 2023

# BITNILE METAVERSE, INC.

(Exact name of registrant as specified in its charter)

| Nevada | 001-40701 | 30-0680177 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

303 Pearl Parkway Suite 200, San Antonio, TX 78215
(Address of principal executive offices) (Zip Code)

(800) 762-7293
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.001 par value | BNMV | The Nasdaq Capital Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 1.01**          **Entry into a Material Definitive Agreement.**

On August 25, 2023, the board of directors (the "**Board**") of BitNile Metaverse, Inc. (the "**Company**") approved a spin-off of the Company's wholly owned subsidiary Zest Labs, Inc. ("**Zest Labs**").

Pursuant to a stock purchase agreement (the "**SPA**"), the Company has agreed to sell all its outstanding shares of Zest Labs to Zest Labs Holdings, LLC, ("**Zest Holdings**") a new entity specifically created for this spin-off (the "**Transaction**"). The purpose of Zest Holdings is to preserve and monetize ongoing lawsuits involving Zest Labs, as of November 15, 2022, including Zest Labs' lawsuit against Walmart, Inc. (the "**Pending Litigation**").

The Transaction is also intended to fulfill the Company's previous commitment to spin-off Zest Labs to those shareholders who held the Company's common stock as of November 15, 2022 ("**Record Date Holders**"). After the Pending Litigation is settled or adjudicated, Zest Holdings is required to distribute a minimum of 95% of the net proceeds to the Record Date Holders. Additionally, the Board highlighted that the Transaction would alleviate the Company of roughly $800,000 in liabilities related to the Pending Litigation.

The foregoing summary description of the terms of the SPA may not contain all information that is of interest to the reader. For further information regarding specific terms and conditions of the SPA, the complete text is incorporated herein as Exhibit 10.1.

**Item 9.01**          **Financial Statements and Exhibits.**

**(d)**          **Exhibits:**

| Exhibit No. | Description |
|---|---|
| 10.1 | Stock Purchase Agreement dated as of August 28, 2023, between Zest Labs, Inc. and Zest Labs Holdings, LLC. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document and included in Exhibit 101). |

-2-

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**BITNILE METAVERSE, INC.**

Dated: September 1, 2023

/s/ Henry Nisser
Henry Nisser
President and General Counsel

-3-

# Exhibit 3

**LOCAL NEWS**

# Walmart to pay $222.7M in retrial loss to Zest Labs over trade secrets

Zest Labs wins retrial against Walmart, securing $222.7 million after alleging tech theft and evidence concealment.



Credit: AP
(AP Photo/Charles Krupa, File)

Close Ad



CHRIS BROWN CONCERT CANCELED

**IN OTHER NEWS**

Chris Brown's Memphis concert canceled

BENTONVILLE, Ark. — Walmart has been ordered to pay $222.7 million in a retrial case won by technology company Zest Labs on May 13, 2025, according to the U.S. District Court for the Eastern District of Arkansas.

The years-long feud dates back to 2018 when Zest Labs alleged that Walmart "stole Zest's revolutionary technology and incorporated it into a patent that was later published, destroying Zest's trade secret," according to Arkansas Business.



ADVERTISEMENT

SCROLL TO CONTINUE WITH THE CONTENT

In the original trial, Zest Labs was awarded $115 million, but U.S. District Judge James Moody Jr. set it aside when new evidence came out, prompting a retrial.

Zest Labs alleged that Walmart had concealed "crucial evidence that would have greatly aided Zest" during the trial. Now, the retrial again ruled in favor of Zest.

Zest was awarded $72,700,000.00 in compensatory damages and $150,000,000.00 in punitive damages, totaling the $222.7 million, according to court records.

Walmart released the following statement regarding the case:

*"We strongly disagree with the verdict and believe it's not supported by the facts. Zest Lab's unethical behavior has compromised the integrity of this case from the start. We expect our suppliers to uphold the highest ethical standards and will continue to advocate for fairness and justice, including pursuing an appeal and post-trial motions."*

**Forget Furosemide, Use This Household Item To Help Drain Edema Fluid**

Forget Furosemide, Use This Household Item To Help Drain Edema Fluid

**WellnessGuide |** Sponsored

Learn more

**Just Add 1 Drop Of This Household Item To Any Dark Spot and Wait 3 Minutes**

Soak Your Dark Spots With This One Thing (Trending Morning Routine)

**WellnessGuide |** Sponsored

Learn more

**Mother demands apology after Florida teacher's birthday gesture toward student**

WATN

**Tennessee Supreme Court again denies City of Memphis request for stay in union suit**

WATN

**LOADING NEXT ARTICLE...**

# Exhibit 4

# Walmart reaches settlement with food waste tech company



Grocery Dive, an Industry Dive publication · Grocery Dive · Industry Dive

**Jeff Wells**
July 30, 2025 • 2 min read

 

**In this article:**

WMT +0.62% ☆

*This story was originally published on Grocery Dive. To receive daily news and insights, subscribe to our free daily Grocery Dive newsletter.*

Walmart has agreed to a settlement with Zest Labs, the food waste technology company that first sued the retailer seven years ago over claims it stole trade secrets.



The deal brings to a close a complex legal battle that just months ago resulted in a federal jury ordering Walmart to pay Zest Labs more than $222 million. Walmart said at the time it would appeal that verdict, but this week's settlement rules out that option.

Judge James M. Moody of the U.S. District Court for the Eastern District of Arkansas said in a Monday filing that he had been notified that the two sides reached a settlement. Walmart stated to Arkansas Business that it and Zest Labs "agreed to a confidential settlement that resolves all issues between them."

Zest sued Walmart in 2018, claiming Walmart had stolen its cold-chain management technology that extends produce shelf life. The tech company said it showed the technology to Walmart executives in 2014 and entered into a confidential agreement a few months later. Walmart eventually released a solution called Eden that Zest said closely resembled its invention.

## Edema Is Not From Salty Food. Meet the Real Enemy of Swollen Legs

FootRenew

In 2021, a jury awarded Zest $115 million, but in 2023, Judge Moody granted a new trial at Walmart's request after learning that Zest withheld relevant evidence. The plan to force a second showdown backfired for Walmart. In May, a federal jury ordered the retailer to pay Zest $222.7 million, which includes $72.7 million for trade secret misappropriation and $150 million for exemplary damages.

"Zest's technology had the potential to reduce approximately 30-33% waste of perishable foods in half. But Walmart's misuse of Zest's trade secret has hindered our ability to achieve the necessary scale to

0019

make a substantial impact and help feed the world," Gary Metzger, manager of Zest Labs, said in a May statement.

**Recommended Reading**

- Walmart to pay tech company $222M over trade secret misappropriation



Terms and Privacy Policy    Privacy Dashboard



# Recommended Stories



### 4 Retirement Planning Tips Robert Kiyosaki Swears By

GOBankingRates • 10h ago



### Retirees, Get Ready for This Unpleasant Medicare Surprise in 2026

Motley Fool • 1d ago



### $4 Stock Tapping Into the $1.2 Trillion AI Boom

Ad • Bullseyealerts



### When will mortgage rates go down to 5%?

Yahoo Personal Finance • 5h ago