1  Todd E. Kennedy, Esq.
   Nevada Bar No. 6014
2  Martin A. Little, Esq.
   Nevada Bar No. 7067
3  Jonathan W. Fountain, Esq.
   Nevada Bar No. 10351
4  HOWARD & HOWARD ATTORNEYS PLLC
   3800 Howard Hughes Parkway, Suite 1000
5  Las Vegas, Nevada 89169
   Telephone: (702) 257-1483
6  Email: tek@h2law.com
   Email: mal@h2law.com
7  Email: jwf@h2law.com

8  Anthony Boccamazzo, Esq.
   Has complied with LR IA 11-2
9  Joseph M. Calder Jr., Esq.
   Has complied with LR IA 11-2
10 OLSHAN FROME WOLOSKY, LLP
   1325 Avenue of the Americas
11 New York, New York, 10019
   Telephone (212)-451-2300
12 Email: ajb@olshanlaw.com
   Email: jcalder@olshanlaw.com
13
   *Attorneys for Plaintiffs RiskOn International,*
14 *Ecoark, Inc., and Hyperscale Data, Inc.*

15            **UNITED STATES DISTRICT COURT**
                   **DISTRICT OF NEVADA**
16

17 RISKON INTERNATIONAL, INC.,           Case No. 2:25-cv-02042-APG-NJK
   ECOARK, INC., and
18 HYPERSCALE DATA, INC,                  **PLAINTIFFS' REPLY IN SUPPORT OF**
                                          **PLAINTIFFS' MOTION FOR TRO AND**
19                          Plaintiffs,   **PRELIMINARY INJUNCTION**

20 v.                                     (Oral Argument Requested)

21 ZEST LABS HOLDINGS, LLC and            Redacted Public Version
   GARY METZGER,
22

23                         Defendants.

24

25

26

27

28

HOWARD & HOWARD ATTORNEYS PLLC

1
2
3
4

Plaintiffs RiskOn International, Inc. ("RiskOn"), Ecoark Inc. ("Ecoark"), and Hyperscale Data, Inc. ("Hyperscale", and collectively with RiskOn and Ecoark, "Plaintiffs"), by and through their undersigned counsel, respectfully submit this reply in further support of their motion for a temporary restraining order and preliminary injunction (the "Motion").

5

**PRELIMINARY STATEMENT**[1]

6
7
8
9
10
11
12
13
14
15

Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction confirms Plaintiffs' fear: Defendants are scrambling to form a plan in an effort to feign their compliance with the intent of the SPA. However, the Defendants' hastily put-together plans, all done *reactively* and in *response* to Plaintiffs' lawsuit, continue to threaten to permanently deprive Plaintiffs and their shareholders of bargained-for consideration. Since August, Plaintiffs have repeatedly informed Defendants that their ill-advised plan to distribute settlement proceeds to DTC will not satisfy their obligations under the SPA. Despite Plaintiffs' personal experience in an analogous situation, Defendants continue to stubbornly stand by their position and refuse to cooperate with the Plaintiffs in agreeing to an approach that actually accomplishes the goals of the SPA: getting the Walmart Settlement Funds into the hands of Plaintiff RiskOn's shareholders.

16
17
18
19
20
21
22
23
24
25
26

To be clear, the Defendants first announced on October 7, 2025 that they intended to imminently distribute the Walmart Litigation proceeds to DTC.  On that same date, Plaintiffs filed their Verified Complaint and original Motion for Temporary Restraining Order and Preliminary Injunction in Nevada state court.  There is nothing in the Defendants' Opposition that suggests that they had consulted with anyone at DTC, Strettto, Inc. ("Stretto") or Professor Mayhew at that time. Instead, in response to Plaintiffs' lawsuit, the Defendants are now scrambling to justify their previous outlandish position by engaging multiple third parties—further dwindling the proceeds owed to RiskOn's shareholders.  This is exactly what Plaintiffs have been trying to avoid for months by repeatedly offering to work cooperatively with the Defendants to ensure that the Walmart Litigation proceeds reach Plaintiff RiskOn's shareholders without further diluting those funds with expensive third-party "experts."  However, the Defendants, in their obstinance, only respond to Plaintiffs'

27
28

[1] Capitalized terms not defined in the section shall have the meaning ascribed to them in the body of this reply or in the Motion.

4904-4919-1292, v. 1

outreach when Plaintiffs take legal action.

Plaintiffs have presented an ample basis for a temporary restraining order and preliminary injunction: Plaintiffs' breach of contract claims are likely to succeed on the merits; Defendants' actions and planned actions threaten to irreparably deprive Plaintiffs of valuable consideration; Defendants will suffer no prejudice from interim relief; and the public interest is served by vindicating Plaintiffs' rights under the SPA. In response, Defendants primarily contend that the TRO and Preliminary injunction should be denied, because the Defendants continue to believe the best course of action to deliver the Walmart Litigation proceeds to Plaintiff RiskOn's shareholder is by dumping those proceeds at DTC, with no instructions, and letting DTC and the participant broker-dealers sort out the mess and distribute the funds to the beneficial shareholders. However, Defendants' position is entirely meritless.

*First,* a distribution to DTC is contrary to the fundamental intent of the agreement: to monetize the Walmart Litigation for the benefit of RiskOn's shareholders. Defendants' interpretation leads to the absurd result of sending many millions of dollars to non-parties. *Second,* Defendants' theory that a distribution to DTC would, eventually, result in a distribution to beneficial owners is undermined by Defendants' own witnesses and is at odds with Plaintiffs' first-hand experience. Defendants' planned distribution would invite massive administrative risk and likely ensure that some RiskOn shareholders never receive the distribution to which they are entitled.

## ARGUMENT

**A.**     **Plaintiffs' Breach of Contract Claim is Likely to Succeed On The Merits.**

**1.**     **The SPA Requires a Distribution to Beneficial Owners.**

Despite Defendants' arguments, the SPA requires more than a distribution to DTC. As Plaintiffs explained in their Motion, the text, structure and intent of the SPA make clear that Defendants' obligation to "facilitate the distribution" of Walmart Litigation proceeds was intended for the benefit of RiskOn's actual, i.e., "beneficial," owners as of November 15, 2022. (ECF No. 18-3 (the "SPA"), § 2(a).)

The plain text of the SPA supports this interpretation. The SPA requires a distribution to "Record Date Owners," which is colloquially used in the securities industry to refer to shareholders

who hold shares as of a particular date. (SPA, Cl. 3, § 2(a); ECF 18-1 ("Nisser Decl.") ¶ 23.) Both RiskOn's principal exchange, NASDAQ, and its principal regulator, the Securities and Exchange Commission, use similar definitions. NASDAQ, defines "Record Date" to mean only the "[d]ate by which a shareholder must officially own shares in order to be entitled to a dividend." "Record Date," https://www.nasdaq.com/glossary/r/record-date. Similarly, the position that an entity is "not the record holder of any Company stock because the securities were held through CEDE & Co" "has consistently been rejected" by the SEC. *Comerica Incorporated*, 2009 WL 800002, at *3 (S.E.C. No-Action Letter).

Other clauses of the SPA confirm the same intent. The SPA makes it clear that Zest Holdings was "formed for the benefit of Ecoark's security holders entitled to participate" in the prior, planned spin-off, and confirms that Zest Holding's "distribution of net proceeds" is "consistent with the expectations" of those shareholders. (SPA, Cl. 4, § 2(a).) Those clauses are only comprehensible if the intended recipients of the litigation proceeds are RiskOn's actual shareholders. RiskOn confirmed as much in its subsequent SEC filing: "[t]he purpose of Zest Holdings is to preserve and monetize ongoing lawsuits involving Zest Labs" and "[t]he [SPA] is also intended to fulfill the Company's previous commitment to spin-off Zest Labs to those shareholders who held the Company's common stock as of November 15, 2022." (ECF 18-4, 4.)

Furthermore, the SPA was the conclusion of a multi-stage campaign to self-liquidate the assets of RiskOn for the benefit of its shareholders. (Mot. 5-6.) As disclosed in SEC filings, RiskOn "decided it was in the best interest of its stockholders that it divest all of its principal operating assets through a series of spin-offs or stock dividends" and planned to spin off 100% of the common stock of Zest Subsidiary to its shareholders. (ECF Nos. 18-2, 15; Nisser Decl. ¶ 6.) Ultimately RiskOn determined instead to sell Zest Subsidiary to Zest Holdings and have Zest Holdings distribute any litigation proceeds to RiskOn shareholders. That plan would only make sense if the ultimate distribution were made to RiskOn's beneficial owners.

Defendants' contrary argument is unavailing. Defendants argue a distribution to "Record Date Owners" requires them to distribute only to "persons and entities on [RiskOn's] stock ledger. (Opp. 13-14.) As a result, they are "required" to distribute approximately 80% of the settlement

proceeds to a non-party to the contract, Cede & Company, a nominee name for DTC, which serves as the depository for virtually all shares issued in the public market. (Nisser Decl., ¶ 17.)

Such a distribution breaches two fundamental principles of contract interpretation. First, it would undermine the clear intent of the parties to facilitate the distribution of assets to RiskOn's actual shareholders. *Am. First Fed. Credit Union v. Soro*, 359 P.3d 105, 106 (Nev. 2015) ("objective" of contract interpretation under Nevada law "is to discern the intent of the contracting parties"). Second, it would ensure the "absurd result" that a non-party would receive tens of millions of dollars for no reason. *Nevada State Educ. Ass'n. v. Clark Cnty. Educ. Ass'n*, 482 P.3d 665, 673 (Nev. 2021) ("[A]n interpretation is not reasonable…if it leads to an absurd result.")

Defendants wave away these concerns by reference to a variety of questionably applicable sources to argue that "security holders of record" *unambiguously* means "stockholders that appear on the corporate ledger." (Opp. 13.) First, they cite to a section of the Nevada Revised Statutes concerning "Private Corporations"[2] and the "Voting rights of stockholders," which instructs that "'Stockholders of record' means a person whose name appears on the stock ledger of the corporation." (Opp. 13 (citing NRS 078.010).) However, there is nothing in the SPA to suggest that the parties were relying on Nevada's Revised Statutes use of the term "stockholders of record" of "Private Corporations" when discussing RiskOn's—a public corporation—shareholders. That an inapplicable statute defines "record holders" a certain way does not make "security holders of record" or "Record Date Owner" unambiguous for the purposes of interpreting the SPA.

Next, Defendants cite to three cases that purportedly define "stockholder of record," "record owner," and "of record" to refer only to shareholders recorded in the corporate records. (*Id.*) But none of those (out-of-Circuit) cases dealt with contract interpretation. *See, Rainbow Nav., Inc. v. Pan Ocean Nav., Inc.*, 535 A.2d 1357, 1358 (Del. 1987) (affirming Court of Chancery after trial); *Sadler v. NCR Corp.*, 928 F.2d 48, 50 (2d Cir. 1991) (affirming SDNY order directing corporation to produce list of Non-Objective Beneficial Owners); *Ramirez v. Gilead Sciences, Inc.*, 66 Cal.

---

[2] In their reply briefing in support of their motion to dismiss, Defendants cherry-pick cites from NRS Chapter 78 to argue that "numerous sections of Chapter 78 apply to publicly traded corporations." (ECF No. 39, 6.) That does not address the applicability of Defendants' proffered definition here, and does not dispute that the definition is not incorporated into the SPA.

HOWARD & HOWARD ATTORNEYS PLLC

App.5th 218, 220 (Cal. App. 2021) (affirming trial court books and records order). Instead, each case adjudicated—sometimes after hearing extrinsic evidence—the rights of shareholders under relevant state corporations law to company records.

Defendants also note that Black's Law Dictionary defines "stockholder of record" to mean "[t]he person who is listed in the issuer's books as the owner of stock on the record date." (Opp. 14 (quoting *Stockholder of Record*, Black's Law Dictionary (12th ed. 2024).) But the same dictionary also defines "record date" to mean only "[t]he date on which a stockholder must own shares to be entitled to vote or receive a dividend." *Date*, Black's Law Dictionary (12th ed. 2024.)

Finally, Defendants close with the irrelevant argument that the that "the contracting parties understood the difference between a 'record' owner and a 'beneficial' owner" because RiskOn represented that it is the 'record and beneficial owner' of shares." (Opp. 14 (quoting SPA, § 3.1).) But Plaintiffs never disputed the difference between a "record" owner and a "beneficial" owner. Instead, Plaintiffs dispute Defendant's interpretation of "Record Date Owner" to mean "record owner," and argue it will lead to the absurd result of a multi-million-dollar distribution to DTC.

## 2. A Distribution to DTC Will Not Result in a Distribution to Beneficial Owners.

Seemingly conceding that their "record owner" theory will lead to an absurd result that cannot be required under the SPA, Defendants pivot to the argument that, in any event, a distribution to DTC will, eventually and hypothetically, lead to a distribution to beneficial owners. Defendant's hypothesis is wrong.

Plaintiffs argued in their Motion that a distribution to DTC would make the settlement proceeds irretrievable. (Mot. 14.) This is because Defendants failed to identify and create a list of eligible shareholders as of the November 15, 2022 record date. (Mot. 10; Nisser Decl. ¶ 22, 33.) The identification of shareholders in advance of a record date is a foundational requirement of securities clearance, settlement and distribution. (Nisser Decl. ¶ 33.) Under SEC Rule 10b-17, issuers like RiskOn are required to provide their principal exchanges 10-days' notice in advance of setting the record date for any dividend or distribution.[3] This is essential, because without that lead time, broker-

---

[3] Defendants suggest that Rule 10b-17 is "inapplicable" because it was originally intended to protect against market manipulation. (Opp. 15.) Defendants ignore that both NASDAQ and FINRA have

HOWARD & HOWARD ATTORNEYS PLLC

dealers cannot timely identify beneficial owners and the distribution may be disrupted. Where, as here, the preemptive identification of beneficial shareholders *never* occurred, it becomes virtually impossible to retroactively identify the beneficial owners. (*Id*.) In Plaintiffs' first-hand experience, each of NASDAQ and DTC has informed RiskOn that the retroactive construction of a list of beneficial shareholders is impossible when this proactive requirement is not met. (Nisser Decl. ¶¶ 23-24, 28-29.) In 2023, RiskOn similarly failed to provide the proper notice to NASDAQ and could not identify qualifying shareholders in advance of a dividend. DTC was unable to render any assistance to RiskOn as it attempted to remedy the situation. (*Id*. ¶ 35.) This lesson is doubly true here, where three years have passed since the record date. (*Id*. ¶ 36.)

Defendants respond by claiming that statutory recordkeeping obligations and Article 8 of the UCC mean that DTC and its participants have the necessary records to effect a distribution, and that they are obligated to do so. But this argument is based on the unfounded assumption that DTC and its participants—which comprise hundreds of third-party brokers who are largely unknown to Defendants—have acted in perfect compliance with recordkeeping requirements and will act in compliance their obligations under the law to pass funds along to the ultimate beneficial owners. Defendants also conspicuously omit that, under the relevant recordkeeping rules, both clearing agencies and brokers are only required to keep records in an "easily accessible place" for two years; an obligation long since passed. 17 C.F.R. § 240.17a-4(a); 17 C.F.R. § 240.17a-1(b). That records of Plaintiffs' beneficial owners as of November 15, 2022 *may* be stashed away in warehouses is hardly reassuring. The process proposed by Defendants invites the risk of massive administrative error by hundreds of third parties into the equation. Defendants cite *In re PLX Tech. Inc. S'holders Litig.* for the premise that, once DTC receives its distribution, "it will be up to each DTC participant to distribute its share of the settlement consideration to its entitlement holders." No. CV 9880-VCL, 2022 WL 1133118 at *6 (Del. Ch. Apr. 18, 2022). But this is precisely the problem—rather than adhere to their obligations under the SPA, Defendants wish to offload their administrative burden to

adopted the same 10-day requirement. NASDAQ Rule 5250(e); FINRA 6490(a). In the FINRA context, the failure to comply may trigger a deficiency notice if "there is significant uncertainty in the settlement and clearance process for the security." FINRA Rule 6490(d)(3). It is flatly untrue that SEC Rule 10b-17 only exists because of a concern for market manipulation.

HOWARD & HOWARD ATTORNEYS PLLC

hundreds of DTC participants whom they have not, and cannot, assure will be up to the task.

Indeed, Defendant's purported expert[4], Dr. Stewart Mayhew, unwittingly admits that a distribution to DTC would be an administrative catastrophe. In support of his argument that "direct pay settlements" through DTC are commonplace and administratively efficient, Professor Mayhew cites to a section of a 2025 report from Broadridge, a securities industry service provider that supports broker-dealers to process and settle trades, entitled "*Direct payment settlements [i.e., settlements sent directly to DTC] causing administrative complications*," to note that "28 direct payment settlements [were] approved by courts in 2024." (ECF No. 31-2 ("Mayhew Decl.") ¶ 12.) In that same report, Broadridge, discusses the very complications at issue here, noting that "direct pay settlements":

> **Pose[] administrative challenges for DTC participants, such as managing distributions to those who have closed their accounts or where ownership records may be incomplete or outdated.** Broadridge is actively collaborating with its clients to [develop a] solution for these complexities and help them mitigate related risks.

Broadridge, *2025 Global Class Action Annual Report*, https://www.broadridge.com/_assets/pdf/bbd-gca-annualreport25-1.29.25-final.pdf, at 7 (emphasis added). Moreover, Professor Mayhew's affidavit is completely at odds with his most recent publication, *published just one-and-a-half months ago*—which laments, in the Section 11 context, that "given the realities of how securities are held, cleared, and settled," "the transfer of shares from/to DTC accounts cannot be sequenced, disaggregated, or mapped to individual trades." The problem of tracing in Section 11 securities litigation, Stewart Mayhew, Westlaw Today, 1, 4 (Sept. 23, 2025). Professor Mayhew, in stark contrast to his affidavit, states in that article that, with respect to DTC, "all securities are commingled in a fungible mass and beneficial owners' claims are not explicitly attached to any specific securities." (*Id.* at 1.) Likewise, Professor Mayhew acknowledges

---

[4] Defendants present the testimony of Dr. Mayhew as though he is an expert in the niche field of securities settlement and clearing. A careful review of Dr. Mayhew's report, however, reveals that he has never had firsthand experience with DTC nor cleared a single trade. Instead, Dr. Mayhew is a consulting economist and has only ever encountered DTC in the regulatory context. Because of the serious questions concerning Dr. Mayhew's credibility to opine on securities settlement and clearance or broker-dealer standard practice, this Court should enter a TRO, schedule an evidentiary hearing for Plaintiffs' preliminary injunction motion, and permit Plaintiffs to depose Dr. Mayhew concerning his relevant expertise and present their own expert in opposition.

Howard & Howard Attorneys PLLC

that the "[e]xecuting brokers may or may not know the identity of the investors for whom the trade is executed" and that the "[c]learing firm[s] may not know the identity of the investor whose trades they are clearing." (*Id.* at 2.) Professor Mayhew's September article reflects the reality at issue here; because all securities at DTC are "commingled in a fungible mass," executing and clearing brokers "may or may not know the identity of the investors for whom the trade is executed," which makes tracing beneficial share ownership, three years after the fact without any supporting records, a nightmarish prospect.

Here, three years after the purported record date, where a list of beneficial owners as of November 15, 2022 was never compiled, these "administrative challenges" are all but certain. Moreover, these "administrative challenges" are exactly the kind of issues that are discussed in the cases cited in support of Defendants' opposition to Plaintiffs' motion to dismiss (which Defendants attempt to distinguish in a footnote). (Opp. 18, n.6). For instance, in *COR Clearing, LLC v. Calissio Resources Group*, a plaintiff sold shares after the record date incurred "past due" bills from DTC's automated clearing system as a result of a recording error. 918 F.3d 579, 583 (8th Cir. 2019). And in *Sabby Volatility Warrant Master Fund v. Jupiter Wellness, Inc.*, a plaintiff did not receive a dividend because it sold its shares after the record date. 2025 WL 1363171, No. 24-2777 (2d Cir. May 12, 2025).[5]

Defendants' argument confirms Plaintiffs' fears all along: Defendants only assumed DTC would be up to the task and are only now endeavoring to find out the truth. Plaintiffs have advised Defendants since August that, based on their prior experience with DTC, Defendant's plan to distribute settlement proceeds to DTC would be catastrophic. But Defendants' Opposition suggests that they have only just started to seriously consider how they would actually carry out that distribution. At no point prior to the Opposition did Defendants clue Plaintiffs in on their communications with DTC or disclose that they retained Stretto to facilitate a distribution through

---

[5] Defendants state that *Sabby* did not involve "DTC at all." The Complaint in *Sabby* makes clear that the issuer failed to alert its transfer agent or DTC that it had changed the record date, and because of that failure, the beneficial owner plaintiff did not receive its dividend. *Sabby Volatility Warrant Master Fund Ltd. v. Jupiter Wellness, Inc.*, 1:23-cv-07874, 2023 WL 10948488 (Amended Complaint), ¶ 30.

4904-4919-1292, v. 1

HOWARD & HOWARD ATTORNEYS PLLC

DTC. (*See* Opp., 11; Hughes Decl. ¶ 10.) In fact, that information was absent from the October 7 shareholder update and only hinted at in the October 18 update. (ECF Nos. 18-5, 18-6.) The reason why is on the face of the Hughes Declaration: *Defendants only began reaching out to DTC in October*; shortly after Plaintiffs' lawsuit was filed. (ECF No. 31-3, ¶ 10.) Defendants' haphazard Opposition highlights Plaintiffs' concern that Defendants are scrambling to avoid their responsibilities and continue to burn cash in the process.

### 3. Defendants' Spending Breaches the SPA.

Defendants have materially breached the SPA by wasting away two-thirds of settlement proceeds without any meaningful oversight. (Mot. 10.) This spending breaches the implied covenant of good faith and fair dealing, because it treats Defendants and other RiskOn shareholders unfairly and arbitrarily and deprives Plaintiffs of the benefit of their bargain by spending it. *Sonoma Springs Ltd. P'ship v. Fidelity and Deposit Co. of Maryland*, 409 F. Supp.3d 946, 957 (D. Nev. 2019) (implied covenant "prohibits arbitrary or unfair acts by one party that work to the disadvantage of the other") (quoting *Nelson v. Heer,* 163 P.3d, 420, 427 (Nev. 2007)).

Defendants insist that their spending is appropriate, because ███████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████

Defendants suggest that Metzger's unauthorized multi-million-dollar fee is permitted by the Operating Agreement for Zest Holdings and contemplated by a SEC filing from January 2023. (Opp. 20.) But Metzger's purported fee is not listed in the SPA, which is the operative document.

9

HOWARD & HOWARD ATTORNEYS PLLC

HOWARD & HOWARD ATTORNEYS PLLC

**4.    Plaintiffs Have Demonstrated Other Breaches.**

Defendants' failure to compile a list of beneficial owners following the execution of the SPA also breached their contractual obligations. (Mot. 10.) Specifically, Defendants are obligated under Section 7.1 of the SPA to take "any further action" that is "necessary or desirable to carry out the purpose of this Agreement," yet never compiled this essential list. Defendants reply by arguing that "it would be a routine exercise for the brokerage firms whose customers held RiskOn stock to identify the underlying beneficial owners," but this unadorned assertion is facially incredible in the face of this litigation, which would not be proceeding if a list of beneficial owners could so easily be procured. (Opp. 20.) Defendants also make the baseless claim that they cannot have breached their obligations, because only RiskOn can request a list of beneficial owners. This argument would be more credible if Defendants had requested beneficial owner information for the first time before November 4, 2025. (*Id.* at 11.) Finally, Defendants deflect Plaintiffs' reasonable request that they make use of existing work product, which Defendants concede identifies approximately 70% of beneficial owners, by baselessly asserting that Plaintiffs seek a windfall from the Walmart Settlement. This rank speculation deserves no credit from the Court.

**B.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A TRO AND PRELIMINARY INJUNCTION.**

Defendants' breaches of the SPA and intended actions will irreparably harm Plaintiffs because Defendants intend to distribute a substantial percentage of the settlement proceeds to a third party from whom it would be difficult to retrieve the funds or squander the proceeds by racking up additional expenses. (Mot. 15.) Because the Walmart Litigation proceeds are Zest Holdings' sole assets, Plaintiffs will be left without any remedy at law once Defendants deplete or distribute the funds. (*Id.*; Nisser Decl. ¶ 8); *see e.g., In re Adelphia Comms. Corp.*, 361 B.R. 337, 351 (S.D.N.Y. 2007) (irreparable harm where "[o]nce the distributions are made pursuant to the Plan, it will be impracticable to ever fashion effective relief for Appellants"). Defendants do not dispute that Zest Holdings will be essentially judgment-proof following the distribution. (*See,* ECF 31-1, ¶ 12.)

Instead, they argue first that "[n]o interim or injunctive relief is necessary" because they will not make any distribution "to DTC until it has adequate assurance that doing so will allow the

10

beneficial owners to receive their portion." (Opp. 21-22.) If Defendants are committed to that position, they should consent to interim relief. Because Defendants refused to stipulate to similar interim relief to avoid this motion, Plaintiffs respectfully doubt Defendants' sincerity. (Mot. 8.)

Defendants also make the unsupported assertion that, even if they were to make a distribution to DTC, "RiskOn and Ecoark would suffer no harm because[] they are not shareholders and are not entitled to any distribution." This is flatly false. RiskOn sold its entire interest in Zest Subsidiary to Zest Holdings in exchange for the sole consideration of a distribution of litigation proceeds to its shareholders. If that distribution does not happen, RiskOn and Ecoark will have been deprived the benefit of their bargain. As a matter of basic contract law, that is a breach causing harm. *Main Street Investments III, LLC v. HUDL Brewing Co., LLC*, 550 P.3d 848, at *4 (Nev. Ct. App. 2024) Defendants' suggestion that none of the parties has standing to represent the beneficial owners is similarly beside the point: Plaintiffs negotiated for a distribution to beneficial owners, and Defendants now refuse fulfill their obligations.

**C.    THE BALANCE OF HARDSHIPS WEIGHS IN FAVOR OF PLAINTIFFS.**

The balance of hardships favors Plaintiffs because Defendants threaten to unilaterally spend or transfer millions of dollars that properly belong to Plaintiffs' shareholders to a non-party from whom Plaintiffs cannot easily recover. (Mot. 15.) Interim relief here would merely stabilize the status quo and prevent Defendants from irreversibly depriving Plaintiffs of their consideration under the SPA or the distribution to which shareholders like Hyperscale are entitled. (*Id.*) In contrast, Defendants would only need to limit their reckless spending and delay their ill-advised, multi-million-dollar transfer. In response, Defendants deflect and deny. Their argument that Plaintiffs would suffer no harm from a distribution to DTC is nonsensical, and their deflection that Plaintiffs seek a windfall is baseless speculation. (*Id.* at 22-23.)

**D.    THE PUBLIC INTEREST FAVORS INJUNCTIVE RELIEF.**

Injunctive relief would protect the rights of other RiskOn shareholders by preserving the settlement proceeds, pending further litigation or negotiations between the parties. (Mot. 15.) Injunctive relief would also vindicate the public interest in the predictable enforcement of contracts. *First 100, LLC v. Omni Financial, LLC*, 2016 WL 3511252, at *3, 2:16-cv-00099 (D. Nev. June 27,

HOWARD & HOWARD ATTORNEYS PLLC

11

2016). Defendants' respond with baseless speculation that RiskOn seeks an unjustified windfall, and that Defendants' plan to distribute funds to DTC is "the most fair and efficient way to ensure that the greatest number of shareholders receive their respective payments." (Opp. 23.) As discussed extensively, this is simply not true.

## E.    Only a Minimal Bond Should be Required.

Defendants respond to Plaintiffs' request for a minimal security bond by arguing that the "Motion seeks to interfere with the distribution of "many millions of dollars" by enjoining the process Zest Holdings has put in place to distribute the settlement funds in accordance with the SPA" and that Zest Holdings will incur additional "administrative costs" as a result of this Motion. (Opp. 24.) It is clear from Defendants' Opposition that its "process" to distribute the settlement funds only began in earnest *after* Plaintiffs filed suit and moved for injunctive relief. That Defendants will now incur administrative costs as they figure out how to actually make the distribution they promised is not cause for the Court to impose a significant security bond.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court enter an order granting the relief requested above.

Dated: this 26th day of November, 2025.

Respectfully submitted,

OLSHAN FROME WOLOSKY LLP

By: /s/ Anthony J. Boccamazzo
Anthony Boccamazzo, Esq.
Has complied with LR IA 11-2
Joseph M. Calder Jr., Esq.
Has complied with LR IA 11-2
1325 Avenue of the Americas
New York, New York, 10019
Telephone (212)-451-2300
Email: ajb@olshanlaw.com
Email: jcalder@olshanlaw.com

-and-

HOWARD & HOWARD ATTORNEYS PLLC

By: /s/ Jonathan W. Fountain
Todd E. Kennedy, Esq.

HOWARD & HOWARD ATTORNEYS PLLC

12

Nevada Bar No. 6014
Martin A. Little, Esq.
Nevada Bar No. 7067
Jonathan W. Fountain, Esq.
Nevada Bar No. 10351
3800 Howard Hughes Parkway, Suite 1000
Las Vegas, Nevada 89169
Telephone: (702) 257-1483
Email: tek@h2law.com
Email: mal@h2law.com
Email: jwf@h2law.com

*Attorneys for Plaintiffs RiskOn International,
Ecoark, Inc., and Hyperscale Data, Inc.*

HOWARD & HOWARD ATTORNEYS PLLC

13

4904-4919-1292, v. 1